UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

HealthSouth Corporation, a
Delaware corporation,

Plaintiff,

v.

MEMORANDUM OPINION
AND ORDER
Civil No. 00-880 (MJD/JGL)

Health Fitness Corporation, a
Minnesota corporation; Orthopedic
Rehabilitation Specialists, a Minnesota
corporation; Mark Siewert; and
Terry Buisman,

Defendants.

---

Teresa J. Kimker and Amanda Cialkowski, Halleland Lewis Nilan Sipkins & Johnson, P.A. for and on behalf of Plaintiff.

Todd Wind and Melissa Vogt Brettingen, Fredrikson & Byron, P.A. for and on behalf of Defendant Health Fitness Corporation.

Michael O. Freeman and Marc A. Al, Lindquist & Vennum P.L.L.P. for and on behalf of Defendants Orthopedic Rehabilitation Specialists, Mark Siewert and Terry Buisman.

---

Currently before the Court are Defendant Health Fitness Corporation's ("HFC") motion for summary judgment and Defendants Orthopedic Rehabilitation Specialists ("ORS"), Mark Siewert and Terry Buisman's motion for summary judgment. Plaintiff HealthSouth Corporation ("HealthSouth") has also moved to strike the affidavits submitted with Defendants ORS, Siewert and Buisman's Reply Brief.



FILED FEB 13 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

Introduction

On May 14, 1999, HFC sold several physical therapy ("PT") clinics to HealthSouth. Two of these clinics were located in Minnesota, and were known as the SOPT ("Sports & Orthopedic Physical Therapy") clinics. One SOPT clinic was located in the Medical Arts Building in downtown Minneapolis, the other located at the Heart Institute at Abbot Northwestern Hospital. After the closing, HealthSouth alleges that when its personnel arrived at the SOPT clinics on Monday, May 17, 1999, they were surprised to find no patients or employees. HealthSouth alleges that it then learned that three of the physical therapists that had worked at the SOPT clinics had opened up their own clinics, under the ORS name, in the Medical Arts Building and at the Heart Institute, and had taken the employees and patients of the SOPT clinics with them. The claims raised by HealthSouth in this action arise from the fact that it was not informed that competing clinics would be opened in close proximity to the SOPT clinics.

The claims asserted against HFC are breach of contract, misrepresentation, fraudulent inducement, reformation, and unjust enrichment. As against the ORS Defendants, HealthSouth has alleged claims of tortious interference with contract and prospective relations and deceptive trade practices, conversion and conspiracy.

Factual Background

HFC began looking for buyers for its PT clinics in August 1998. HealthSouth first expressed its interest in the HFC PT clinics at that time. Prior to the commencement of negotiations, HFC forwarded a confidentiality agreement to HealthSouth, which would allow both parties to exchange confidential information, while protecting the

confidentiality of such information. One term of this agreement prevented the parties from disclosing the fact of the negotiations or the terms of the negotiations. HealthSouth asserts that pursuant to this term, it could not contact HFC employees prior to the sale without HFC's permission. It appears, however, that HFC did give HealthSouth permission to speak with the key employees at each of the clinics that were the subject of the sale. With regard to the SOPT clinics, the key employee was identified as Mark Siewert.

Siewert was the original owner of the Minneapolis SOPT clinic. He sold the clinic to HFC in 1994, and at that time, had entered into an employment agreement that terminated on April 13, 1999. Thom Berkowitz was hired by HFC to broker the sale of its PT clinics. He was also Siewert's financial adviser. He allegedly told HealthSouth representatives that Siewert didn't know what he was going to do after HealthSouth purchased the SOPT clinics; that maybe he would go "bass fishing." HealthSouth asserts that Berkowitz's statements left them with the clear impression that Siewert was probably going to retire. His words also gave HealthSouth no indication that Siewert would be opening a competing clinic in close proximity to the SOPT clinics. Berkowitz, on the other hand, states that his words to HealthSouth that Siewert may go "bass fishing" were made "tongue-in-cheek", but that he nonetheless told HealthSouth to ask Siewert of his future plans.

Thereafter, in late March 1999, HealthSouth did meet with Siewert to discuss employment opportunities with HealthSouth. No agreement was reached at that meeting, and to the HealthSouth representatives that he spoke with, Siewert appeared

noncommital. HealthSouth eventually tendered a job offer to Siewert, but he declined the offer. At their meeting with Siewert, HealthSouth was aware that his employment and non-compete agreement with HFC was to terminate in April 1999. See Kimker Aff., Ex. 9. Nonetheless, no representatives of HealthSouth spoke with Siewert again prior to closing. HealthSouth asserts that its representatives tried to contact Siewert again on several occasions, but that he refused to return their calls.

Berkowitz also allegedly told HealthSouth that the other physical therapist that worked at the Minneapolis SOPT, Terry Buisman, was not financially stable, and that as a result, he was not going anywhere, assuring HealthSouth that Buisman would continue at the Minneapolis SOPT clinic after the sale. However, shortly after it became known that HFC was seeking a buyer for its PT clinics, Buisman incorporated ORS. Kimker Aff., Ex. 18. ORS eventually leased space in the Medical Arts Building and at the Heart Institute, but did not begin operations until May 17, 1999. Prior to the start date, ORS, through Buisman, also arranged the purchase of equipment, and completed the necessary health insurance paperwork. In addition to Buisman, Siewert and Carol Lego, the physical therapist at the Heart Institute, joined ORS as well as other administrative HFC employees. Evidence has been presented to show that Siewert was also involved, at least on a limited basis, in assisting Buisman ready ORS for operation. There is evidence that he had contact with a leasing agent in February 1999, regarding office space in the Medical Arts Building.

HealthSouth has a company policy of not entering into employment agreements. Because of that policy, a term of the Purchase Agreement required HFC to terminate its

employees prior to closing, and to settle any earn-out issues:

> Seller's (sic) have negotiated agreements with former shareholders of Sellers (from whom Sellers purchased Sellers' business) for the settlement of claims related to earn-out payments and employment agreements with such former shareholders.
>
> Seller's (sic) have also notified other employees of Sellers' Business that such employees' employment shall be terminated as of the Effective Date, and that any employment agreements between any Seller and such employee shall become null and void as of the Effective Date.

Purchase Agreement, Ex. D., § 2.11. Pursuant to this term, HFC asserts it entered into a Settlement Agreement with Siewert to resolve any claims that existed between the two parties. This Settlement Agreement provided that Siewert would release all claims against HFC in exchange for a $100,000 non-contingent payment, and an additional $350,000 payment, contingent on the sale of HFC's clinics prior to June 30, 1999. Kimker Aff., Ex. 16. The Settlement Agreement also provided that "HFC acknowledges that the term of your employment agreement will expire on April 13, 1999; provided, however, you agree to serve as a consultant to SOPT on a 40-hour work week basis, performing substantially the same duties you have performed to date, until the earlier of a 'qualified sale' or May 15, 1999." Id.

HFC further asserts that pursuant to § 2.11 of the Purchase Agreement, HFC also informed its employees by letter dated May 13, 1999, that their employment with HFC would terminate effective the date of closing. See, eg., Al Aff., Ex. 11. HealthSouth intended, however, to hire many of the clinic employees and those employees were identified in Exhibit E to the Purchase Agreement. Both Buisman and Lego were listed on Exhibit E. Yet, none of the employees listed on Exhibit E were contacted by HealthSouth

by the end of business on May 14, 1999, nor did HFC inform them that they would be hired by HealthSouth.

Standard for Summary Judgment

Summary judgment as a matter of law is appropriate when no genuine issue of material fact exists in the record. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250 (1986). A fact is material if resolving disputes concerning that fact affects the outcome of the case. See Anderson, 477 U.S. at 248. A dispute is genuine if, based on the evidence, a reasonable jury could return a verdict for either party. See id. at 252. On a motion for summary judgment, the Court views all evidence and inferences in a light most favorable to the nonmoving party. See id., 477 U.S. at 250. The moving party carries the burden to demonstrate the absence of any genuine issue of material fact. Fed. R. Civ. P. 56(b); Celotex, 477 U.S. at 323.

HFC's Motion for Summary Judgment

1. Breach of Contract

It is HealthSouth's position that the primary asset sold by HFC was the good will of the clinics; which is defined as the relationships between the physical therapists, the patients and the physicians. In the Purchase Agreement, $3,475,000 of the $3,575,000 purchase price was attributed to good will. Purchase Agreement, § 1.3(d). To ensure that the good will of the clinics remained intact, the Purchase Agreement contained a warranty from HFC that:

> Since March 31, 1999, there has not been any material adverse change in the assets or business of the Seller's Business or in the type or number of Seller's rehabilitation and therapy patients. The Sellers are unaware of any event which may materially change the type or number of Seller's rehabilitation or therapy patients after the consummation of the transactions contemplated by this Agreement, except for the industry-wide changes affecting the physical therapy business generally in the states where Seller's Businesses are located and except for general economic conditions.

Purchase Agreement, § 2.15.

In addition, the Purchase Agreement provided:

> "To the knowledge," "to the best of knowledge, information and belief", or any similar phrase shall be deemed to include the assurance that such knowledge is based upon a reasonable investigation, unless otherwise expressly provided. Unless otherwise expressly provided herein, knowledge of the Sellers shall be deemed to include facts known to any officer, director or managerial employee of the Sellers.

Id. § 8.8.

HealthSouth contends that these provisions of the Purchase Agreement were breached because HFC knew, or should have known, of the establishment of the ORS clinics and failed to disclose such fact to HealthSouth prior to the closing. HFC argues that none of its officers, directors or managerial employees, as of May 14, 1999, knew anything of the ORS clinics. HFC does not dispute that Siewert could have been considered a "managerial employee" as that term is used in § 8.8 while he was employed by HFC. However, his employment terminated prior to the closing, therefore his knowledge cannot be imputed to HFC as of the date of the closing. HFC further argues that although Buisman and Lego were supervisory physical therapists at the SOPT clinics, they were not managerial employees for purposes of § 8.8.

Although the Purchase Agreement did not define the term "managerial employee" as used therein, the parties' understanding of such term is controlling here. At his deposition, Mr. Clark, HealthSouth's Regional Vice President, stated that he believed the term managerial employee referred to those employees in HFC's corporate office who participated in the HealthSouth meetings, and the individual owners of the clinics that they had purchased, i.e., Mark Siewert. Clark Dep. 104. There is no dispute that neither Buisman or Lego participated in the meetings with HealthSouth, and there is no dispute that Buisman and Lego were not owners of the clinics HFC had purchased. Accordingly, HealthSouth has failed to show that it ever considered Buisman or Lego managerial employees as that term was used in § 8.8. As such, their knowledge of the ORS clinics cannot be imputed to HFC.

Because the knowledge of Siewert, Buisman and Lego cannot be imputed to HFC, HealthSouth must show that HFC nonetheless knew these individuals were planning to open competing clinics. HealthSouth has failed to make this showing. No evidence has been presented to show that any HFC representative knew of ORS prior to the closing.

HealthSouth further argues that even if HFC did not have actual knowledge of ORS prior to the closing, it had a contractual obligation to conduct a reasonable investigation into any matter that may materially affect the SOPT clinics. HealthSouth argues that if such an investigation was done, it would be reasonable to conclude that the establishment of ORS would have been discovered.

HealthSouth first asserts that it was incumbent on HFC to inquire of Siewert, Buisman and Lego as to whether they were intending to open a competing clinic.

Assuming HFC had such a duty, the evidence before the Court shows that such an inquiry would have been fruitless. Siewert testified at his deposition that he refused to discuss his future plans with either HealthSouth or HFC, as he was not contractually obligated to either. Siewert Dep. 57. HealthSouth has put forth no evidence that Buisman or Lego would not have responded in kind.

HealthSouth further argues that as Siewert and Buisman openly conducted ORS business at the SOPT clinics prior to closing, such as sending and receiving faxes, hiring SOPT employees and telling patients to report to the ORS clinic for their next appointment, HFC would have discovered ORS' existence upon investigation. Contrary to HealthSouth's assertions, the evidence before the Court does not raise a genuine issue that ORS business was conducted openly at the SOPT clinics prior to the closing. First, to support its assertion that patients were told to report to the ORS clinic for its next appointment, HealthSouth has submitted the deposition testimony of Kelly Casey, an employee of HealthSouth. She testified that after May 17, 1999, patients stopped into the SOPT clinic asking where the physical therapy clinic moved to, or that other patients told her that they were told to report to the new clinic for their appointment. Casey Dep. 37. As to whether patients were wrongfully diverted by the ORS defendants, the Court determines that the Casey deposition is hearsay, and is therefore not admissible. In addition, Casey cannot identify the patients that told her they were told to report to the new clinic, nor can she identify who told these patients to report to the new clinic. As no direct or other admissible evidence has been submitted to show that patients were wrongfully diverted, HealthSouth's claim in this regard fails. See, Firemen's Fund Ins. Co.

v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993).

HealthSouth further asserts that Lego admitted in her deposition that she called patients on the afternoon of May 14, 1999, and told patients to report to the ORS clinic for their next appointment. Such assertion is not supported by her deposition transcript. In fact, Lego testified that she made some calls to let patients know that she would not be at the SOPT clinic any longer, and that the patient could choose to stay at SOPT or could choose to stay with her. Lego Dep. 74.

The evidence also fails to support HealthSouth's assertion that SOPT employees were openly hired by ORS while still employed with HFC. While the evidence shows that Lego was approached by Siewert and Buisman prior to the closing, and that Lego informed her assistant that she may be going to another clinic after the closing, there is no evidence that other HFC employees were hired prior to their termination from HFC. The evidence further shows that Siewert, Buisman and Lego specifically discussed keeping information regarding ORS a secret. Siewert Dep. 163-164. Under these circumstances, HealthSouth has failed to show that ORS openly hired HFC employees prior to closing.

Finally, evidence that three faxes related to ORS business were transmitted through the SOPT clinics does not raise a genuine issue of material fact that ORS business was conducted openly in the SOPT clinics prior to closing, and that HFC would have discovered such evidence of ORS prior to closing. Because HealthSouth has failed to put forth evidence which raises a genuine issue as to whether HFC knew or should have discovered through investigation that Siewert and Buisman planned to open competing clinics, HFC is entitled to summary judgment with regard to HealthSouth's claim that it

breached either § 2.15 or § 8.8 of the Purchase Agreement.

HealthSouth also alleges that HFC breached certain warranties contained in § 2.11 of the Purchase Agreement. Pertinent to this case, HFC warranted that as of March 1, 1999, it had not:

> (a) incurred any material obligation or liability (absolute, accrued, contingent, or otherwise) related to [HFC's] business;
> (b) . . . canceled any debts or claims or waived any rights related to [HFC's] business, except in the ordinary course of business;
> (c) increased the compensation of any officer, employee, consultant or agent in connection with [HFC's] business;
> *
> (e) . . .entered into any material transaction in connection with [HFC's] business, other than in the ordinary course of business.

Purchase Agreement, § 2.11.

HealthSouth argues that HFC breached these provisions when it entered into the Settlement Agreement with Siewert, and failed to disclose such fact and the terms of said agreement to HealthSouth. The Court disagrees.

First, the Purchase Agreement required HFC to enter into settlements with the former owners of the HFC clinics.

> Seller's have negotiated agreements with the former shareholders of Sellers (from whom Sellers purchased Sellers' Business) for the settlement of claims related to earn-out payments and employment agreements with such former shareholders.

§ 5.3, Exhibit D to the Purchase Agreement.

There is no dispute that the Settlement Agreement between HFC and Siewert settled outstanding claims regarding the earn-out payments and Siewert's employment agreement. Thus, the fact that a Settlement Agreement was entered into does not constitute a breach of § 2.11.

Nor do the terms of the Settlement Agreement constitute a breach. HealthSouth argues that it was unaware that the Settlement Agreement contained a term which specifically released Siewert of his obligations under the non-compete agreement. However, HealthSouth representatives admitted that they were aware that Siewert's employment agreement and his non-compete with HFC terminated prior to the closing. Clark Dep. 59, Parks Dep. 78. In addition, any obligations created by the non-compete would have terminated upon the termination of the employment agreement. See, Burke v. Fine, 608 N.W.2d 909, 913 (Minn. Ct. App. 2000). Thus, irregardless of the Settlement Agreement, Siewert would not have been bound by a non-compete agreement at the time of closing, and HealthSouth was aware of such fact. Accordingly, HealthSouth has failed to show that failure to disclose the term of the Settlement Agreement regarding the non-compete somehow caused it harm. As a result, HealthSouth cannot recover on a breach of contract. See, Lipka v. Minn. School Employ. Ass'n., 537 N.W.2d 624, 631 (Minn. Ct. App. 1995) aff'd 550 N.W.2d 618 (Minn. 1996).

Further, any payments made to Siewert under the Settlement Agreement had no effect on the assets purchased by HealthSouth, thus such payments did not constitute a material transaction made in connection with HFC's business, or a material obligation related to HFC's business. Finally, the Court rejects HealthSouth's argument that the consultant agreement with Siewert resulted in an increase in his compensation from HFC. HFC asserts that the consulting fee was equal to his base salary, plus compensation for benefits that he also received as an employee. HealthSouth has put forth no evidence to the contrary. Accordingly, HFC is entitled to summary judgment with regard to claims

that HFC breached § 2.11 of the Purchase Agreement.

2. Fraudulent Inducement

HealthSouth argues that HFC, primarily through its agent Thom Berkowitz, fraudulently induced HealthSouth to enter into the Purchase Agreement. Specifically, HealthSouth alleges that Berkowitz told them that Siewert was burned out and that he was likely to retire. Based on the fact that Berkowitz was also Siewert's financial advisor, HealthSouth asserts it reasonably relied on these statements in believing that Siewert would not compete with the SOPT clinics.

An actionable claim of misrepresentation in Minnesota requires proof that the one making the misrepresentation did so dishonestly or in bad faith - with fraudulent intent. Florenzano v. Olson, 387 N.W.2d 168, 173 (Minn. 1986). The elements of a fraudulent misrepresentation are: a false representation, having to do with a past or present material fact, such fact being susceptible of knowledge, the representer must know it to be false, or in the alternative, must assert it as his own knowledge without knowing whether it is true or false, the representer intended the other person rely upon the representation, and such person did so rely and suffered damages as a direct result of the representation. Davis v. Re-Trac, 276 Minn. 116, 117, 149 N.W.2d 37, 39 (1967).

HealthSouth has failed to raise a genuine issue on three of these elements; that Berkowitz made the statements knowing they were false, or that the statements were made as his own knowledge without knowing whether the statements were true or false, and that Berkowitz intended HealthSouth to rely on such statements, or that HealthSouth justifiably relied on such statements.

Berkowitz admitted at his deposition that he told HealthSouth representatives that "maybe he'll [Siewert] go bass fishing." Berkowitz Dep. 138. He also stated that his comments regarding Siewert's future plans were made tongue in cheek, and that he told HealthSouth that if they wanted to know what Siewert's plans were, they had to ask him himself. Id.

Jeff Parks, one of HealthSouth's representatives, testified at his deposition that Berkowitz told him on a number of occasions "that he really had no idea where Mark, what he would do but that he was – didn't need to work and that he would likely go off and did something else but if he decided to get back in therapy, that it would be near his house." Parks Dep. 82-83 (emphasis added). Mr. Clark testified that Berkowitz told him that "Mark was financially independent, he didn't have to work, he's burned out, quote, unquote, is what he told us. It would not surprise me if Mark didn't do anything, if he left and retired and went bass fishing." Clark Dep. 92-93 (emphasis added).

From these statements it is clear that both Parks and Clark understood that Berkowitz did not definitively know of Siewert's future plans. It is also clear that both perceived Berkowitz's statements as his opinion as to Siewert's future plans. HealthSouth has thus failed to raise a genuine issue of fact that Berkowitz made the statements knowing they were false, or that he gave the impressions that the statements were made of his own knowledge, not knowing of their truth or falsity.

The evidence, even when viewed in HealthSouth's favor, also does not support its assertion that Berkowitz intended that HealthSouth rely on his statements regarding Siewert's future plans, or that HealthSouth did, in fact, rely on Berkowitz's statements.

Berkowitz testified that he told HealthSouth representatives that if they wanted to know what Siewert was going to do, they had to ask Siewert. This was confirmed by Clark in his deposition. Clark Dep. 121. The evidence is undisputed that HealthSouth thereafter met with Siewert and specifically asked him what his plans were. The evidence is also undisputed that HealthSouth made Siewert an offer, and that such offer was never accepted.

Finally, given the unique factual circumstances present in this case, the Court finds that HealthSouth would not have been justified in relying on Berkowitz's statement. Given the nature of the business that HealthSouth was planning to purchase from HFC, which was almost completely dependent on the goodwill of the individual clinics, it is surprising that HealthSouth did not take the requisite steps to either secure Siewert's employment, or insure that Siewert could not compete with it after the sale, given its admitted knowledge that Siewert's non-compete with HFC would terminate prior to the closing. Parks Dep. 78; Clark Dep. 59. HealthSouth representatives admitted that it is most important that non-compete agreements be executed between it and the key employee clinic owners, to prevent them from opening a shop across the hall. Parks Dep. 35. In fact, HealthSouth successfully negotiated non-compete agreements with the key physical therapists in the other clinics purchased from HFC. Al Aff. Exs. 21-24.

Accordingly, the Court finds that HFC is entitled to summary judgment with respect to the claim of fraudulent inducement.

3. Equitable Remedies

The law is clear in Minnesota that a party cannot maintain a claim for unjust enrichment where an express contract exists. Sharp v. Laubersheimer, 347 N.W.2d 268, 271 (Minn. 1984). HealthSouth concedes this is the law in Minnesota, but argues that as it was fraudulently induced to enter into the Purchase Agreement, no valid contract exists and HealthSouth is entitled to pursue equitable remedies. However, because the Court has found HFC is entitled to summary judgment with respect to the fraudulent inducement claim, HealthSouth has failed to contest the validity of the contract in this case. Accordingly, summary judgment as to the equitable claims asserted against HFC is appropriate.

4. HFC's Counterclaim

HFC brought a counterclaim against HealthSouth, alleging abuse of process and breach of contract. The breach of contract claim is premised on the fact that pre-closing accounts receivable were excluded from the assets purchased by HealthSouth. HealthSouth agreed to assist HFC in collecting the pre-closing accounts receivable, and agreed that it would "not assert any right of set-off or counterclaim against the pre-closing accounts receivable or the checks, drafts, or money designated as payment therefore or any other proceeds thereof." Purchase Agreement, § 8.1. HFC asserts that HealthSouth collected $43,156.36 in pre-closing accounts receivable and has refused to turn such amount over to HFC.

HealthSouth responds that as HFC breached the Purchase Agreement prior to May 14, 1999, the principles of contract law and equity prohibit HFC from asserting a breach

of contract claim. HealthSouth does not otherwise contest that pursuant to the Purchase Agreement, it was not entitled to pre-closing accounts receivables and that it collected $43,156.36 in pre-closing accounts receivables.

As HealthSouth failed to show that HFC breached any provision of the Purchase Agreement, HFC is entitled to summary judgment on its breach of contract claim.[1]

ORS, Siewert, and Buisman's Motion for Summary Judgment

1. Tortious Interference with Contract

HealthSouth claims that Defendants Siewert, Buisman and ORS knew of the impending sale of the HFC clinics to HealthSouth, and that these defendants interfered with the Purchase Agreement related to such sale by causing HFC to breach certain provisions of the Purchase Agreement.

To state a claim for tortious interference with contract, HealthSouth must show (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages. Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn.1994) (quoting Furlev Sales and Assoc. v. North American Automotive Warehouse, Inc., 325 N.W.2d 20, 25 (Minn.1982)).

As discussed above, HealthSouth has failed to raise a genuine issue of fact that HFC breached any provision of the Purchase Agreement. Accordingly, this claim must fail.

[1]HFC agrees to dismiss its abuse of process claim.

2. Tortious Interference with Prospective Relations

To succeed on an intentional interference with prospective relations claim, HealthSouth must show that Siewert, Buisman and ORS intentionally and improperly interfered with HealthSouth's ability to work with the patients and employees of the SOPT clinics, and the referring physicians, by "(a) inducing or otherwise causing the patients not to enter into or continue the prospective relation; or (b) preventing the other from acquiring or continuing the prospective relation." United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 633 (Minn. 1982). HealthSouth bears the burden of proving causation. Id.

HealthSouth asserts that the ORS defendants "crossed the line" from fair competition when it solicited SOPT patients and employees, and the referring physicians. It argues that the ORS defendants used wrongful means to advance its business interests by using confidential information obtained from HFC.

Again, the record does not support HealthSouth's assertions. With respect to patients, Lego, Buisman and Siewert told patients, either on the day of the closing or a day or two before, they may no longer be working at the SOPT clinic after May 14, 1999. Lego Dep. 53-54; Buisman Dep. 77-80; Siewert Dep. 121. In fact, Buisman specifically denied telling patients that beginning May 17, 1999, they should go to Suite 1750, where ORS was located. Buisman Dep. 80.

To show that the ORS defendants wrongfully solicited SOPT patients, HealthSouth submitted the deposition testimony of Kelly Casey, an employee of HealthSouth. As discussed above, however, this evidence is hearsay, and does not properly oppose the

ORS defendants' motion for summary judgment on this issue. As no direct or other admissible evidence has been submitted to show that patients were wrongfully diverted, HealthSouth's claim in this regard fails. See, Firemen's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993).[2]

Nor is there any evidence to show that physicians were wrongfully solicited by the ORS defendants. Lego, Buisman and Siewert each deny contacting physicians about the ORS clinics prior to the closing. To support its claim, HealthSouth has produced a copy of an ORS pre-printed referral form that was signed by a physician on May 17, 1999. Kimker Aff. 49. Since it was signed on May 17, 1999, HealthSouth asks the Court to assume that such form had to have been distributed prior to that date. In response, the ORS defendants cite to an affidavit submitted by Buisman that the early prescriptions, such as that found in Exhibit 49 to the Kimker Affidavit, were the result of a verbal order by telephone, and that Buisman filled out the form. Court Docket No. 37.[3]

Nor is there any evidence to show that Lego, Buisman or Siewert obtained physician information through improper means. The ORS defendants testified that they did not obtain physician information from SOPT resources, that such information was obtained through a working relationship pre-dating their employment with HFC, or

---

[2]In response to HealthSouth's arguments that patients were wrongfully diverted, the ORS defendants submitted a number of affidavits from patients which are consistent with the position of the ORS defendants that patients were not told to report to the ORS clinic for their next appointment. HealthSouth moved to strike the affidavits, as being improperly submitted with a reply brief. Although the Court does not agree with the position of HealthSouth, the Court nonetheless need not take the patient affidavits into consideration as HealthSouth failed to put forth sufficient evidence which raises a genuine issue that patients were wrongfully diverted. HealthSouth's motion to strike is therefore moot.

[3]This affidavit was submitted in response to a separate motion for sanctions.

through the Yellow Pages®. Lego Dep. 115-116; Siewert Dep. 139-140; Buisman Dep. 121. HealthSouth has not put forth any evidence to refute these statements.

HealthSouth further asserts that the ORS defendants used improper means to solicit HFC employees. The evidence shows, however, that the only HFC employee Siewert and Buisman approached prior to the closing was Lego, and she testified at her deposition that she would not work for HealthSouth. Lego Dep. 28 and 36. HealthSouth thus cannot establish that, but for Siewert and Buisman, Lego would have accepted employment with HealthSouth. There is also no evidence that Siewert or Buisman approached any other employee until after they received notification that they were terminated on May 14, 1999. When these individuals were offered jobs with ORS, they were neither employees of HFC or HealthSouth, were not bound by any non-compete agreements.

Because competition is favored in the law, the Minnesota courts have recognized a competitor's privilege. United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 633 (Minn. 1982). This privilege protects conduct that concerns a matter involved in the competition; without the use of wrongful means; the action does not create a restraint of trade; with the purpose of advancing a competitive interest. Id. (citing, Restatement (Second) Torts § 768 (1979). The hiring of the SOPT employees falls within this privilege. Accordingly, HealthSouth's claim that the ORS defendants tortiously interfered with their prospective employment relations with prior SOPT employees must fail.

3. Misappropriation of Trade Secrets

HealthSouth asserts that the ORS defendants misappropriated certain of its trade secrets. Specifically, it alleges that the ORS defendants copied its patient lists, and other patient information and its physician referral list; all of which are trade secrets as defined by Minnesota law.

Trade secret is defined in Minn. Stat. § 325C.01, subd. 5 as information that:

> i) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure; and
>
> ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

As discussed above, HealthSouth has not put forth sufficient evidence to withstand summary judgment with regard to its claims that the ORS defendants wrongfully used HFC's physician referral lists. HealthSouth also alleges that the ORS defendants misappropriated patient information, such as patient charts. HealthSouth has not put forth any evidence to support this claim. In fact, all evidence points to the contrary. Kent Malcomson, an HFC representative, assisted HealthSouth in retrieving patient information from the computer system, and testified at his deposition that no patient charts were missing from either of the SOPT clinics. Malcomson Dep. 140-141. Siewert and Buisman testified that they brought no patient information with them to ORS. Siewert Dep. 179-180; Buisman Dep. 183-184.

Lego did admit that she hand-copied the patient schedule for the week of May 17, 1999 from the appointment book kept at the receptionist desk. A review of relevant

pages from the ORS and SOPT appointment books show that only the last name of the patient is included in the book. See, Kimker Aff. Exs. 40 and 41. To support a claim of misappropriation of a trade secret, HealthSouth must show that the SOPT appointment book, which contained only last names, and the times of their appointment, had independent economic value. See, Electro-Craft Corporation v. Controlled Motion, Inc., 332 N.W.2d 890, 900 (Minn. 1983). HealthSouth has failed to make such a showing.

Accordingly, summary judgment in favor of the ORS defendants is appropriate as to the claim of misappropriation of trade secrets.

4. Deceptive Trade Practices

HealthSouth alleges that the ORS defendants engaged in deceptive trade practices by their misleading alteration of signage in the Medical Arts Building. HealthSouth alleges that upon arriving at the Medical Arts building on May 17, 1999, HealthSouth employees discovered that the lobby directory was altered to indicate that the SOPT clinic had moved to Suite 1750. These employees also discovered that handwritten signs were placed in the lobby indicating that ORS, formerly known as SOPT, was now located at Suite 1750.

Siewert and Buisman both denied directing the building's management to put up the disputed signs. In addition, the ORS defendants have submitted the affidavit of Terry McNeese, who was the maintenance person responsible for the above-referenced signs. In his affidavit, he stated that he misunderstood the directive from the Management Office to make signs showing that Mark Siewert and Terry Buisman had relocated to Suite 1750. McNeese Aff. ¶ 2. He further stated that at no time was he directed by Siewert or

Buisman to make such signs, and that Siewert specifically told him that SOPT should not be included in the signs, and that the correction was made within the hour. Id., ¶¶ 4 and 5.[4]

Summary judgment is therefore appropriate on the claim of deceptive trade practices.

5. Conversion

HealthSouth asserts that common office supplies and physical therapy equipment were missing from the SOPT clinics on May 17, 1999. To support this claim, HealthSouth relies on the deposition testimony of Carrie Joeckel and Kelly Casey. Neither of these HealthSouth employees testified that they were present in the SOPT clinics prior to May 17, 1999, therefore neither has personal knowledge that such equipment was at the SOPT clinics prior to May 17, 1999 and missing thereafter. Summary judgment is thus appropriate on this claim as well.

6. Conspiracy

Because HealthSouth has failed to raise a genuine issue that the ORS defendants engaged in an underlying tort, its claim of conspiracy must fail. Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio, 230 Minn. 327, 337 N.W.2d 818, 824 (1950).

---

[4]HealthSouth also moved to strike the McNeese Affidavit, as it was submitted with the ORS defendants' Reply Brief. The Local Rules neither allow or prohibit the submission of additional evidence with a reply brief. The Advisory Committee Notes provides that Reply Affidavits "are appropriate only when necessary to address factual claims of the responding party that were not reasonably anticipated." The ORS defendants argue that they did not anticipate that HealthSouth would ask the Court to infer that because the signage was changed, it was reasonable to infer that the ORS defendants directed the change be made. It argues that the McNeese Affidavit only became necessary when HealthSouth asked that the Court make such inferences, even though all evidence submitted thus far contradicted such inferences. The Court finds that based on these circumstances, the Court will accept the McNeese Affidavit and deny HealthSouth's motion to strike.

IT IS HEREBY ORDERED that:

1. Health Fitness Corporation's Motion for Summary Judgment is GRANTED in its entirety.

2. Orthopedic Rehabilitation Specialists', Mark Siewert's and Terry Buisman's Motion for Summary Judgment is GRANTED in its entirety.

3. HealthSouth Corporation's Complaint is DISMISSED WITH PREJUDICE.

4. Health Fitness Corporation is awarded judgment against HealthSouth in the principal amount of $43,156.36 plus interest as permitted by law.

5. Count I of HFC's Counterclaim is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Date: 2-13-02

Michael J. Davis
United States District Court

Civil No. 00-880 (MJD/JGL)

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.